# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| TROY PETERSON, ) | |
|     Plaintiff ) | Civil Action No.: 7:16cv00217 |
| ) | |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| E. BARKSDALE, et al., ) | |
|     Defendants ) | |

The plaintiff, Troy Peterson, ("Peterson"), an inmate incarcerated at Red Onion State Prison, ("Red Onion"), in Pound, Virginia, and proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that the defendant prison officials, all of whom are employees of the Virginia Department of Corrections, ("VDOC"), violated his Eighth Amendment rights by providing inadequate nutrition, resulting in weight loss and health problems. Peterson seeks compensatory and punitive damages and injunctive relief ordering the defendants to provide a healthy vegetarian diet of at least 2,000 calories a day. This case is before the court on the Defendants' Motion For Summary Judgment. (Docket Item No. 24), ("the Motion"). Peterson has responded to the Motion, (Docket Item No. 27), and none of the parties has requested a hearing on the Motion, making it ripe for disposition. The Motion is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). For the reasons that follow, the Motion will be granted, and summary judgment will be entered in favor of all of the defendants on Peterson's § 1983 claims.

## I. Facts[1]

Peterson is a VDOC inmate currently, and at all times relevant to his Complaint,[2] housed at Red Onion. In his Complaint, he claims that he has been denied adequate nutrition, stating that the meal trays do not contain the correct foods or that they do not amount to 2,000 daily calories. Instead, Peterson claims the inmates are receiving only 1,000 calories or less daily. Peterson claims that the vegetarian trays are unhealthy, and there is no vegetarian menu. Instead, the meat is substituted with beans. Peterson claims that, as a result of inadequate nutrition, he has lost 40 pounds in six months, despite eating his entire tray. He claims that he cannot maintain his health, noting weight loss, sickness and rashes. In his Amended Complaint, Peterson describes the defendants' various duties. Specifically, he states that E. Barksdale is the Warden at Red Onion, and he did nothing even after his complaints were reported to him many times. Peterson stated that P. Scarberry, the Director of Food Services at Red Onion, "runs the kitchen" at Red Onion and that she must "ok" all the trays/meals. Peterson states that Natarcha Gregg, the Dietician for the VDOC, "made the menu."

In support of the Motion, the defendants have supplied sworn affidavits from Gregg, Scarberry and J. Bledsoe, the Head Nurse at Red Onion. (Docket Item Nos. 25-1 to 25-3.) They also have provided various menus for specific relevant time periods, (Encl. A to Docket Item No. 25-1), Peterson's Common Fare Agreement

---

[1] On a motion for summary judgment, the court may review a number of materials to determine whether a genuine dispute of any material fact exists, including sworn testimony, affidavits, sworn pleadings, discovery responses and other materials contained in the record. *See* FED. R. CIV. P. 56(C).

[2] Peterson also filed an Amended Complaint. *See* Docket Item Nos. 16, 20. Both the Complaint and the Amended Complaint will be referred to collectively as "the Complaint."

and a summary of his Meal Preference, (Encls. A and B to Docket Item No. 25-2), and relevant medical records. (Encl. A to Docket Item No. 25-3.) Peterson has been incarcerated at Red Onion since March 11, 2015. (Docket Item No. 25-1, ("Gregg Affidavit"), at 1). All VDOC facilities follow the Master Menu and adhere to portions indicated thereon. (Gregg Affidavit at 1.) Meal planning and preparation considers food flavor, texture, temperature, appearance and palatability. (Gregg Affidavit at 1.) Portion control is used in meal planning, preparation and service in order to prevent plate waste and leftovers. (Gregg Affidavit at 1.) Portions are served in those quantities indicated on the Master Menu, and the food served to offenders also is served to staff. (Gregg Affidavit at 1-2.) According to Gregg, portion control is enforced for both staff and offenders. (Gregg Affidavit at 2.) The Master Menu is a four-week rotating menu that ensures that nutritionally adequate menus are made available as approved by the VDOC Dietician. (Gregg Affidavit at 2.) An alternate/vegetarian entrée for each meal also is indicated on the Master Menu. (Gregg Affidavit at 2.) According to Gregg, the average daily calorie count for three meals from the Master Menu is 2,600 to 2,700 calories. (Gregg Affidavit at 2.) Gregg, as the VDOC Dietician, analyzes the VDOC menus and certifies that they meet or exceed the Recommended Dietary Allowances as defined by the Food and Nutrition Board of the National Academy of Sciences. (Gregg Affidavit at 2.) She stated that VDOC offenders are allowed the privilege to purchase snacks and other food items from the institutional commissary, but that an offender in segregation may not have access to the same. (Gregg Affidavit at 2.) Therefore, she stated that an offender in segregation would need to eat all items on his tray for every meal to obtain the 2,600 to 2,700 daily calories. (Gregg Affidavit at 2.)

Peterson was approved to receive the Common Fare diet on May 24, 2016, at Red Onion. (Gregg Affidavit at 2.) Common Fare is an appropriate religious diet for offenders whose religious dietary needs cannot be met by the Master Menu. (Gregg Affidavit at 2.) The Common Fare menu is based on a 14-day cycle and meets or exceeds minimum daily nutritional requirements. (Gregg Affidavit at 2.) The planned Common Fare menu may not be changed at the facility level, except where seasonal availability of produce items warrants that substitutions be made. (Gregg Affidavit at 2.) All three daily meals on the Common Fare diet yields a 2,600 to 2,700 total daily caloric value with 105 to 110 grams of protein, which is the same as the Master Menu. (Gregg Affidavit at 2-3.) Gregg stated that she had no knowledge that Peterson had not received adequate food portions during his confinement at Red Onion. (Gregg Affidavit at 3.)

In her affidavit, P. Scarberry, the Director of Food Services at Red Onion, states that food service records reflect that Peterson has been on a nonmeat, or meat alternative, diet since April 1, 2016, and on May 25, 2016, he began receiving the Common Fare diet. (Docket Item No. 25-2, ("Scarberry Affidavit"), at 1-2). The nonmeat tray is prepared from the Master Menu, with the meat entrée being replaced with another option. (Scarberry Affidavit at 2.) For the breakfast meal, two ounces of breakfast meat is replaced with the same amount of cheese or peanut butter, at the manager's discretion. (Scarberry Affidavit at 2.) Lunch and dinner consists of beans (1½ cup) or a soy patty on the Common Fare menu. (Scarberry Affidavit at 2.) Only the entrée is replaced, with the remainder of the original menu being followed. (Scarberry Affidavit at 2.) The caloric value of the nonmeat tray, the regular meal tray and the Common Fare diet are the same. (Scarberry Affidavit at 2.) Substitutions are rarely made on the Common Fare menu. (Scarberry Affidavit at 2.) The only meat on the Common Fare menu is tuna, and any other

food with a meat-like appearance is soy based. (Scarberry Affidavit at 2.) On March 2, 2016, Peterson signed a Common Fare Agreement, stating, "This program provides me with an appropriate religious diet that meets or exceeds minimum daily nutritional requirements." (Scarberry Affidavit at 1; Encl. A to Scarberry Affidavit.)

Scarberry stated that, as the Director of the kitchen, she does not look at every tray served, but she performs many daily spot checks on trays. (Scarberry Affidavit at 2.) The Food Service Managers check all trays for each meal. (Scarberry Affidavit at 2.) Additionally, there are many outside inspections where the meals at Red Onion are checked by the VDOC Regional Director of Food Services, during which quality control reports are completed indicating that the food is being prepared and the portions are accurately served in accordance with the menus provided by Gregg. (Scarberry Affidavit at 2.) Scarberry stated that she had no reason to believe that Peterson is not receiving an adequate amount of calories, as his meals are planned and prepared in accordance with VDOC policy. (Scarberry Affidavit at 2-3.)

A Meal Preference summary, dated March 29, 2017, reflects that, on April 1, 2016, Peterson began the meat alternative diet, on May 25, 2016, he began the Common Fare meat alternative diet, and on August 25, 2016, he began the no tuna Common Fare diet. (Encl. B to Scarberry Affidavit).

J. Bledsoe, R.N.C.A., the Head Nurse at Red Onion, also submitted an affidavit to the court, to which several of Peterson's medical records were attached. (Docket Item No. 25-3, ("Bledsoe Affidavit")). When Peterson arrived at Red Onion on March 11, 2015, he was 5 feet 9 inches tall and weighed 188 pounds.

(Bledsoe Affidavit at 1; Encl. A to Bledsoe Affidavit at 77.) On October 13, 2015, he weighed 180 pounds. (Encl. A to Bledsoe Affidavit at 71.) When Peterson saw the physician on December 8, 2015, after a nurse referral due to an incident in which he allegedly fell in his cell on December 6, 2015, he stated, "I don't eat because of religion." (Bledsoe Affidavit at 1; Encl. A to Bledsoe Affidavit at 68.) He stated that he was not on hunger strike, but "I just don't eat my meals … not going to be dishonest to myself." (Bledsoe Affidavit at 1; Encl. A to Bledsoe Affidavit at 68.) His weight was recorded as 160 pounds at that time. (Bledsoe Affidavit at 1.) On January 14, 2016, Peterson's weight was 159 pounds. (Bledsoe Affidavit at 1; Encl. A to Bledsoe Affidavit at 63.) He again stated that he was not eating due to his religion, and he stated that he ate a natural diet, also noting that he did not like beans because he had a sensitive stomach. (Bledsoe Affidavit at 1-2; Encl. A to Bledsoe Affidavit at 63.) Peterson expressed his desire for a peanut butter diet instead of beans. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 63.) He also stated that he wanted a diet from Medical. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 63.) Peterson requested a Common Fare diet. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 62.) The physician informed Peterson that there is no natural diet and indicated that Peterson was not losing muscle mass. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 62.) On January 26, 2016, the physician saw Peterson for persistent right side pain. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 59.) It was noted that Peterson had recent labs which tested positive for Hepatitis C virus. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 59.) His vital signs were stable. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 59.) The physician noted that Peterson was a difficult inmate with diet-related and other requests. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 59.)

On February 3, 2016, Peterson was seen at nurse's sick call claiming that he was having pain in the liver and stomach and could not see out of his left eye. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 58.) Peterson stated "I have Hep C the pain is from that." (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 58.) He also stated "Made me lose 40 [plus] pounds," "I can't eat" and "Can't see out of left eye." (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 58.) The nurse referred Peterson to the physician. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 58.) On February 5, 2016, Peterson was seen by medical staff and stated that he drank chemicals as a child, experienced liver pain and was served beans all the time due to his religion. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 57.) Peterson requested a diet change, stating that the chemicals gave him a sensitive stomach. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 57.) During this visit, Peterson's weight was recorded at 164 pounds. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 57.) On May 3, 2016, Peterson was seen during nurse's sick call for complaints of chest pain. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 54.) On examination, Peterson's vital signs were normal, and he was in no distress. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 54.) On May 13, 2016, Peterson was seen at sick call for stomach pain. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 53.) The nurse noted that he was not in distress and was talking with staff, kicking the cell door and screaming. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 53.) He was referred to the doctor for evaluation. (Bledsoe Affidavit at 2; Encl. A to Bledsoe Affidavit at 53.) On May 17, 2016, Peterson saw the physician for intermittent right upper quadrant pain since December. (Bledsoe Affidavit at 3; Encl. A to Bledsoe Affidavit at 53.) The doctor noted a history of hepatitis and psychiatric issues. (Bledsoe Affidavit at 3; Encl. A to Bledsoe Affidavit at 53.) Peterson stated that he was "not out here about beans" but with beans it is the

worst. (Bledsoe Affidavit at 3; Encl. A to Bledsoe Affidavit at 53.) The doctor explained the lab results to Peterson and noted no acute changes to Peterson's health. (Bledsoe Affidavit at 3; Encl. A to Bledsoe Affidavit at 53.)

On May 19, 2016, the doctor wrote an extension of his May 17, 2016, entry, stating, in part, as follows:

> This meeting with inmate Peterson was difficult as follows. His attitude was ignorant, demanding, not helpful, litigious. I felt his medical statements were rehearsed [and] limited. Ex. 'I have pain here' (RUQ) no mention of time, character, associated [signs or symptoms], only the word 'extreme.' I had to ask about [nausea, vomiting, diarrhea]. His statements include religion related to beans [and] prior Fla [Florida] DOC testing 'ie samples' which were [and] are not in this chart. His statement changed from medical and became litigious describing his list of sick calls [and] what his lawyers said about his hepatic profile. He smiled when I stated this was a litigious meeting. Vital signs are stable, physical exam is negative for acute changes. His labs following his HCV are [checked] 6 [months] with a present APRI = 0.471, x-rays are unremarkable of the cervical, thoracic and lumbar. Extensive past medical histories from [Florida], [Minnesota] and [Massachusetts] show the diagnosis of HCV [and] extensive psych. history. His care is ongoing physically. He is stable presently, X-ray [and] labs have been ordered and he's monitored 24 hrs./day. Next month at another 6 mos. interval a CMC will be done in the ongoing HCV evaluation. Even in this situation I really try to correctly diagnose and treat everyone in spite of the false, self-serving, manipulating daily complaints. Sometimes a diagnosis takes several test[s].

(Bledsoe Affidavit at 3; Encl. A to Bledsoe Affidavit at 51-52.) On July 24, 2016, Peterson's weight was recorded as 160 pounds. (Encl. A to Bledsoe Affidavit at 47.) On August 17, 2016, Peterson's weight was 161 pounds, and in an August 26, 2016, note, the nurse indicated that Sergeant Large reported to the Medical

Department that Peterson had missed five meals at breakfast. (Bledsoe Affidavit at 4; Encl. A to Bledsoe Affidavit at 44.) On September 13, 2016, Peterson's weight was 170 pounds. (Bledsoe Affidavit at 4; Encl. A to Bledsoe Affidavit at 41.) On October 18, 2016, during an appointment with the doctor, Peterson asked to be removed from all medications. (Bledsoe Affidavit at 4; Encl. A to Bledsoe Affidavit at 35.) He weighed 170 pounds at that time. (Bledsoe Affidavit at 4; Encl. A to Bledsoe Affidavit at 35.) On November 11, 2016, he weighed 163 pounds, and on December 15, 2016, he weighed 168 pounds. (Bledsoe Affidavit at 4; Encl. A to Bledsoe Affidavit at 22, 32.)

Bledsoe stated that, based on her review of the record, Peterson had not complained about his meals since May 2016. (Bledsoe Affidavit at 4.) She further stated that Peterson's weight had been consistent during his incarceration at Red Onion, and there was no indication that he was not receiving an adequate diet. (Bledsoe Affidavit at 4.)

As for Peterson's claim that he is suffering from rashes, on September 30, 2015, he saw the nurse for a rash on his abdomen, for which he said hydrocortisone cream did not help. (Bledsoe Affidavit at 4; Encl. A to Bledsoe Affidavit at 72.) The nurse noted patches of skin discoloration to the abdomen, chest and neck area. (Encl. A to Bledsoe Affidavit at 72.) He was referred to the doctor, who examined him on October 13, 2015. (Bledsoe Affidavit at 4; Encl. A to Bledsoe Affidavit at 71-72.) The doctor noted a well-defined, erythematous, raised rash. (Encl. A to Bledsoe Affidavit at 71.) He noted excoriations with folliculitis on Peterson's forearms. (Encl. A to Bledsoe Affidavit at 71.) The doctor indicated that the rash was chronic and prescribed selenium sulfide cream. (Bledsoe Affidavit at 4; Encl. A to Bledsoe Affidavit at 71.) On July 5, 2016, Peterson was seen for a rash on his

arms and a small sore to his right knee. (Bledsoe Affidavit at 4; Encl. A to Bledsoe Affidavit at 48.) He received small Band-Aids and triple antibiotic ointment to apply for three days per verbal order of the doctor. (Bledsoe Affidavit at 4; Encl. A to Bledsoe Affidavit at 48.) On September 13, 2016, minor ecchymosis to the left lower rib area was noted. (Encl. A to Bledsoe Affidavit at 41.) On February 7, 2017, he was seen for a rash to the arm and scrotum area. (Bledsoe Affidavit at 4; Encl. A to Bledsoe Affidavit at 7.) He was given Cortisone 0.5% and was instructed to return if the condition worsened. (Bledsoe Affidavit at 4; Encl. A to Bledsoe Affidavit at 7.) According to Bledsoe, there is no indication that the rashes are related to Peterson's diet. (Bledsoe Affidavit at 4.)

In conjunction with the filing of his Complaint, Peterson also filed a Verified Statement, to which he attached various documents, including an Informal Complaint directed to Food Service, dated January 5, 2016. (Docket Item No. 4 at 3.) In this Informal Complaint, Peterson stated that he had written "many requests" and could not keep losing weight. He stated that his tray was so small, he was given two "just to add up to what I am to get." Peterson specified that he received ¾ cup of beans when he was supposed to get 2½ cups. He reported receiving cake crumbs and mashed up hot dog. Peterson stated that he was being forced to eat beans twice daily because of his religion. He noted that he had requested to have peanut butter in place of processed food. He suggested a menu that he would eat twice daily, once for lunch and once for dinner, including broccoli, ¼ c. peanut butter, ¼ cup of cheese and 1 cup of carrots.[3] There is no response to this Informal Complaint. Nonetheless, Peterson filed a Regular Grievance on February 21, 2016, stating that he had sent in both an informal complaint and a grievance, stating that

---

[3] This portion of the Informal Complaint is not entirely legible.

the January 5 informal complaint was returned because the menu was followed and that it was Peterson's choice whether to eat it or not. He stated, however, that he did not have this response because when he sent it in with the Grievance, it was not returned. He stated that he remained forced to sit in his cell and eat beans for lunch and dinner and eat small portions. He stated that he kept track of everything fed to him, which was totaling 900 to 1,200 calories daily. Peterson stated that he had lost 38 pounds in the prior six months, but further stated that he could not say all the weight loss was due to the trays because a lot of food on the trays violated his beliefs as an Odinist. However, he stated that 7 out of 10 trays are half the portion size as stated on the menu and that butter is never included on the trays. Peterson asked to be placed on a diet that provides his body with what it needs and that the beans be replaced with peanut butter or cheese in order to follow his religion. On March 21, 2016, this Grievance was returned to Peterson for failing to attach the appropriate informal complaint. (Docket Item No. 4 at 5.)

Peterson wrote a letter, dated March 31, 2016, regarding an inability to observe a religious "feast – ritual."[4] This correspondence did not contain complaints regarding the amount of food being served at Red Onion or its nutritional value. (Docket Item No. 4 at 9.)

*II. Analysis*

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to

---

[4] It is not clear to whom this letter is written, but Peterson received a response from Melissa Welch, Operations Support Manager.

any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.,* 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.*, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

First, I find that Peterson has failed to demonstrate a genuine dispute of material fact that any of the named defendants was personally involved in the alleged denial of adequate nutrition to him. In order for an individual to be liable under § 1983, it must be "affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985). With regard to defendant Natarcha Gregg, the VDOC's

Dietician, Peterson alleges only that she "made the menu." In her affidavit, Gregg does not dispute this statement, as she states that the Master Menu is approved by her. However, she further states that the Master Menu ensures nutritionally adequate meals are provided at all VDOC facilities and that all VDOC facilities adhere to the portions indicated on the Master Menu.

According to Gregg, the daily calorie count for three meals from the Master Menu averages between 2,600 and 2,700 calories, and she analyzes the menus, which are certified to meet or exceed the Recommended Dietary Allowances as defined by the Food and Nutrition Board of the National Academy of Sciences. Although Peterson began receiving the Common Fare diet on May 25, 2016, Gregg states that this menu also meets or exceeds minimum daily nutritional requirements and yields a 2,600 to 2,700 daily caloric value. Gregg specifically stated that she had "no knowledge that Peterson has not received adequate food portions during his confinement at Red Onion State Prison." Gregg attached the Common Fare Menus for April 2015 to March 2016, April 2016 to March 2017 and January 2017 to December 2017.

Peterson also has provided a copy of the Common Fare Menu for January 2017 to December 2017, which he attached to his unsworn response in opposition to the Motion. On this menu, Peterson has handwritten caloric values for each food, as well as daily caloric totals. By Peterson's calculations, this menu provides daily caloric values ranging from 1,200 to 1,540. I find that these menus with handwritten caloric values, attached to Peterson's unsworn response, do not suffice to create a genuine dispute of material fact with regard to either Peterson's daily caloric intake or Gregg's personal involvement in the alleged denial of adequate nutrition, given Gregg's sworn affidavit testimony to the contrary.

With regard to defendant P. Scarberry, the Director of Food Services at Red Onion, Peterson alleges that she "[r]uns the kitchen [therefore] all tray (meals) have to have her ok." However, in her affidavit, Scarberry stated that, as the "Director of the kitchen," she did not look at every tray served, but spot checked many trays daily. Instead, Scarberry stated that the Food Services Manager checked all trays for each meal, and many outside meal inspections were conducted by the VDOC Regional Director of Food Services, resulting in quality control reports which indicate the food is being prepared and the portions are accurately served in accordance with the menus provided by VDOC Dietician Gregg. Scarberry stated that she had no reason to believe that Peterson was not receiving an adequate amount of calories, as his meals are planned and prepared in accordance with VDOC policy. Thus, I find that Peterson has failed to show a genuine dispute of material fact as to whether Scarberry was personally involved in the alleged denial of adequate nutrition to him. Simply stating that she runs the kitchen and must approve all trays is not sufficient to create a dispute of fact, given Scarberry's sworn affidavit testimony set out above.

Lastly, with regard to defendant E. Barksdale, the Warden at Red Onion, Peterson stated in his Amended Complaint that, as Warden, Barksdale is the overseer of Red Onion, and he allowed the provision of inadequate nutrition to occur, doing nothing even after it was reported many times. However, Peterson has not provided the court with any evidence that Barksdale had any personal involvement in providing him inadequate nutrition. That being the case, I find that there is no genuine dispute of material fact as to whether Warden Barksdale was personally involved in the alleged provision of inadequate nutrition to Peterson at Red Onion.

Thus, for the aforementioned reasons, I find that Peterson has not shown a genuine dispute of material fact with regard to the personal involvement of any of the named defendants in the alleged Eighth Amendment violation. I further find that Peterson has not shown a genuine dispute of material fact with regard to whether any of these defendants was deliberately indifferent to a serious deprivation of a basic human need.

Peterson argues that his Eighth Amendment rights have been violated because he has received inadequate nutrition which has caused weight loss and rashes. The Eighth Amendment of the United States Constitution prohibits the infliction of cruel and unusual punishment on convicted prisoners. *See* U.S. CONST. amend. VIII. In order to demonstrate cruel and unusual punishment, a plaintiff must establish a serious deprivation of a basic human need and that the defendants acted with deliberate indifference to prison conditions. *See Wilson v. Seiter*, 501 U.S. 294, 299-303 (1991); *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991). The first prong of this standard requires Peterson to show that the deprivation of a basic human need was objectively "sufficiently serious." *Wilson*, 501 U.S. at 298. The second prong requires a showing that, subjectively, "the officials act[ed] with a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298. "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). As for the subjective prong, deliberate indifference requires "something more than mere negligence, … [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). Deliberate indifference requires that a prison official know of and disregard the objectively serious condition or deprivation. *See Shakka*, 71 F.3d at 166.

It is well-settled that food that provides sufficient nutritional sustenance is a basic human need. *See, e.g., Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) (stating that adequate food, shelter, clothing and medical care are the "essentials" that a State must provide prisoners); *Shrader v. White*, 761 F.2d 975, 986 (4th Cir. 1985) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980)) ("It is well-established that inmates must be provided nutritionally adequate food, 'prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'"). The Supreme Court has held that the failure to meet an inmate's basic nutritional needs is cruel and unusual punishment because the inmate relies on prison officials to provide food; if the official fails to do so, the inmate's basic nutritional needs will not be met. *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Inmates are not entitled to be served particular foods, so long as the diets they receive are nutritionally adequate. *See Escalante v. Huffman*, 2011 WL 3107751, at *9 (W.D. Va. July 26, 2011). Also, mere dissatisfaction with the variety, portion size or savor of his prison diet is not sufficient to state a claim. *See Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (stating foreign objects or cold and unpleasant food is insufficient to state an Eighth Amendment claim).

The evidence provided the court does not create a genuine dispute that Peterson received inadequate nutrition. Gregg has provided evidence that the menus she has prepared provide adequate nutrition. Gregg, a dietician, has provided evidence that the Common Fare diet, which Peterson receives, contains 2,600 to 2,700 calories a day. Scarberry has provided evidence that the meals served at Red Onion follow the prepared menus with regard to foods served and the portion size. All Peterson has offered to refute this is his unsworn allegations

that the menus do not contain adequate nutrition in that they contain fewer calories and smaller portions. Peterson's allegations do not create a genuine dispute of fact. Also, in order to show that a deprivation is sufficiently serious, a plaintiff must show that he suffered some serious physical or emotional injury as a result thereof. *See Lopez v. Robinson*, 914 F.2d 486, 490 (4th Cir. 1990); *Shrader*, 761 F.2d at 979; *Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999). While Peterson claims that he suffered a 40-pound weight loss over a four-month period due to inadequate nutrition at Red Onion, his medical records show that he made statements to the Medical Department on two occasions, once in December 2015 and another in January 2016, that he was not eating due to religious reasons. Also, on February 3, 2016, Peterson advised a nurse that he had lost 40 pounds due to his Hepatitis C virus. On August 26, 2016, Sergeant Large reported to medical personnel that Peterson had missed five breakfast meals. The medical records show that Peterson weighed 188 pounds at intake at Red Onion on March 11, 2015, and 168 pounds as of the last medical note provided, dated December 15, 2016. This constitutes a 20-pound weight loss. Peterson's weight did fluctuate some between these two dates, with the lowest weight of 159 being recorded on January 14, 2016. Thus, Peterson's weight did not consistently decline as one would expect if he were regularly being denied adequate nutrition. Instead, for instance, his weight increased from 159 pounds on January 14, 2016, to 164 pounds by February 5, 2016, and up to 170 pounds in both September and October 2016. Peterson never reported his belief that he was losing weight due to the provision of inadequate nutrition, nor did he even report a belief that he was being provided inadequate nutrition. Also, there is no indication in the medical records that this is, in fact, the case. He did state that he preferred peanut butter or cheese to beans, but he did not allege that the provision of beans was resulting in inadequate nutrition. For these reasons, I find that Peterson's weight loss cannot be attributed to the provision of

inadequate nutrition and, thus, it cannot constitute the requisite sufficiently serious injury to sustain an Eighth Amendment claim.

As for Peterson's claim that his rashes were the result of inadequate nutrition, I find that the medical record, similarly, belies any such contention. Peterson complained of a rash on four different occasions from September 30, 2015, through February 7, 2017. These rashes were on Peterson's abdomen, chest, neck, forearms, left lower rib area and scrotum. He was treated conservatively with selenium sulfide cream, Band-Aids, triple antibiotic ointment and Cortisone 0.5% cream. On October 13, 2015, the doctor described the rash as chronic. There is no indication that these rashes were related to each other or that they were the result of inadequate nutrition. In fact, on the dates Peterson complained of these rashes, he had no accompanying diet or weight loss complaints. Peterson's weight was recorded on only one of the occasions that he complained of a rash. Specifically, on September 13, 2016, his weight was recorded at 170 pounds, which actually indicated a 10-pound increase from his weight of 160 on July 24, 2016. Thus, I find that there is no indication that any of Peterson's rashes were the result of the alleged inadequate nutrition he received at Red Onion, and they cannot constitute the requisite sufficiently serious injury to sustain an Eighth Amendment claim.

Next, I find that, even if the court were to assume, arguendo, that these injuries were sufficiently serious to sustain an Eighth Amendment claim, Peterson cannot show that the defendants were deliberately indifferent to the deprivation of adequate nutrition to him. As stated above, both Gregg and Scarberry have provided sworn affidavit testimony that Peterson was receiving adequate nutrition. Likewise, despite Peterson's allegations that Warden Barksdale took no action

after being advised of Peterson's complaints many times, Peterson has produced no evidence that the Warden was ever informed of Peterson's complaints. The only informal complaints or grievances provided by Peterson were directed to Food Services, not Warden Barksdale. Additionally, there is no evidence that Warden Barksdale provided the response to any such informal complaint or grievance. To show deliberate indifference, a prison official must have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990); *see Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("[T]he evidence must show that the official in question subjectively recognized that his actions were inappropriate in light of that risk.").

Here, because there is no genuine dispute of material fact as to whether the defendants knew of a substantial risk of harm to Peterson's health, they cannot be found to have been deliberately indifferent to that risk.

For all of the reasons stated herein, I find that there is no genuine dispute of material fact that the defendants violated Peterson's Eighth Amendment rights by failing to provide adequate nutrition to him. Therefore, I will enter summary judgment in the defendants' favor on these claims.

Although the defendants also argue that they are entitled to summary judgment on qualified immunity grounds, given the court's finding that Peterson has failed to show a genuine dispute of material fact that the defendants violated

his Eighth Amendment rights, I find it unnecessary to address the qualified immunity argument.

An appropriate order will be entered.

ENTERED: July 11, 2017.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE